# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| MAIN STREET BANK, ) | |
| ) | |
| Plaintiff/Counterclaim Defendant, ) | |
| ) | |
| v. ) | |
| ) | No. 4:08-CV-0546 -DGK |
| CARLYLE VAN LINES, INC., ) | |
| ) | |
| Defendant/Counterclaimant/ ) | |
| Third-Party Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| CAPITAL 4, INC., ) | |
| SOLUTIONS PROS, INC. ) | |
| and 3COM CORPORATION, ) | |
| ) | |
| Third-Party Defendants. ) | |

## ORDER DENYING SUMMARY JUDGMENT

This case arises from the collapse of Capital 4 and a "Power of $Zero" program associated with it.

Under the "Power of $Zero" business model Capital 4 would enter a long-term contract with a customer to provide telecommunications services at a fixed monthly rate, and then subcontract out the actual provision of these services to a local telecommunications company, keeping for itself the difference. Capital 4's customers paid for multiple years of service up-front and, as part of the deal, received telephone equipment or a cash rebate. A handful of companies such as Main Street Bank provided the financing for these deals. The idea was that customers would repay the financing entity by making fixed payments over time, eventually repaying the entire cost of the equipment or rebate, the telecommunications service, and the financing charges. There are allegations that these transactions were sufficiently opaque or

misleading that the customers didn't understand the agreements, or who was responsible for providing the telecommunications services if something happened to Capital 4.

At some point after Capital 4's program was up and running, 3Com Corporation became interested in the program, apparently as a way to sell more telecommunications equipment. Beginning in 2005 Capital 4 and 3Com entered into a series of agreements defining their roles and relationship. *De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP*, Nos. 08-533, 08-534, 2010 WL 3322703, at *6-7 (E.D. Pa. Aug. 20, 2010) (giving a brief history of a putative class-action lawsuit involving 3Com, Capital 4, a financing entity, and a class of customers).

This particular case began in 2006, when Capital 4 and SolutionPros, a 3 Com vender, approached Defendant Carlyle Van Lines about participating in a Power of $Zero program. Carlyle subsequently entered into an agreement for telecommunications services with Capital 4, or, as Carlyle alleges, Capital 4 *in partnership* with 3Com. Plaintiff Main Street Bank financed the deal. In the fall of 2007, Capital 4 informed Carlyle that it could no longer meet its obligations to provide telecommunications services, effectively leaving Carlyle in the position of being obligated to pay thousands of dollars every month for telecommunications services it was no longer receiving. Carlyle stopped making its monthly payments, and Main Street sued. Carlyle subsequently counterclaimed and brought claims against Third-party Defendant 3Com for indemnity, breach of contract, misrepresentation, fraud, and conspiracy to commit fraud.

Now before the Court is 3Com's Motion for Summary Judgment (doc. 180). 3Com seeks summary judgment on all of Carlyle's claims against it. Finding that disputed questions of material fact exist which preclude awarding summary judgment, the motion is DENIED.

## Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. But the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).

## Facts

Viewing the evidence in the light most favorable to Carlyle, for purposes of resolving the pending motion the Court finds the facts to be as follows. Controverted facts, facts immaterial to the resolution of the pending motion, facts not properly supported by the record,[1] and legal conclusions have been omitted.

---

[1] 3Com repeatedly cites to portions of the record which do not support the proffered facts; for example, statement of fact 17.

Under the 3Com Power of $Zero program[2] Capital 4 provided telephone and internet services ("public access services") to business customers. 3Com sold its equipment to distributors, who in turn sold the equipment to value added resellers like SolutionPros who, in turn, resold the equipment to customers. Sometimes customers would elect to purchase new or additional 3Com equipment as part of a Power of $Zero transaction.

Beginning in 2005, Capital 4 and 3Com entered into a series of agreements which purportedly defined their respective roles vis-à-vis a Power of $Zero program. On March 10, 2005, 3Com and Capital 4 executed a Rules of Engagement Addendum ("ROEA") which purported to modify a Strategic Alliance Agreement ("SAA") executed between 3Com and Capital 4 on January 31, 2005.[3] 3Com contends the purpose of the SAA and ROEA was to establish a co-marketing relationship by which 3Com would assist Capital 4 in marketing Capital 4's Power of $Zero program.

In December of 2005 Glen Ewing, a 3Com employee, made a presentation to SolutionPros regarding the 3Com Power of $Zero Solution. That same month 3Com produced case study marketing materials referring to a "3Com Power of $Zero Solution." The materials branded the program as a 3Com program and described 3Com as actively marketing and selling the program to customers.

Clark Thompson of SolutionPros, a value-added reseller of 3Com equipment, attended training in Houston in February of 2006 regarding this program. During the training he received

---

[2] The parties vehemently dispute whether there were separate Power of Zero programs owned by 3Com and Capital 4 that are relevant to this case. 3Com occasionally describes a program as a Capital 4 Power of Zero program when it is unclear from the record whether this is the case. For purposes of this motion the Court resolves any ambiguity in Carlyle's favor.

[3] 3Com contends that on January 31, 2005, it executed a Strategic Alliance Agreement ("SAA") with Capital 4. However the "true and accurate copy of the SAA" 3Com cites to in the record is a document that is unexecuted by either party and is undated; indeed, the date blanks near the documents signature line indicate the document was prepared in 2004. The Court holds the document as submitted is not admissible so the Court cannot consider it for purposes of deciding the pending motion.

4

materials describing the program. The training presentation was given by Glenn Ewing, the training materials were reviewed by 3Com prior to the training, and the materials were provided to educate attendees about the program. The presentation and materials branded the program as the "3Com Power of $Zero Solution," referred to 3Com's objective and program strategy, explicitly talked about 3Com branding, referred to the "3Com Power of $Zero Value Proposition," stated that 3Com had developed the program, provided a sample letter announcing the roll out of the 3Com Power of $Zero Solution, and used 3Com branding prominently in a sales pitch for the program.

At the training Thompson was told that the program was funded and backed by 3Com. Based on representations made at the training and the 3Com branding on the materials Thompson believed 3Com backed and funded the entire program.

After the training SolutionPros began signing up customers for the 3Com Power of $Zero Solution. In March of 2006 and Thompson and Mark Kerr of Capital 4 met with John Shupe, a Carlyle representative, to pitch Shupe on the 3Com Power of $Zero Solution. The parties dispute whether Mark Kerr was a representative of 3Com, and thus whether 3Com participated in the meeting. Kerr attended the 3Com sales training event in Houston described above where he was listed as a 3Com Business Development Manager.

On March 28, 2006 Carlyle and Capital 4 entered into a customer agreement. The first sentence of the agreement states that "Capital 4 and [Carlyle] . . . enter this 3Com Power of $Zero Customer Agreement . . under which Capital 4 shall provide, maintain, and support all of Customer's Public Access Services in accordance with the 'How Does the 3Com Power of $Zero Solution Work? section of the eBrochure,' and that [Carlyle] enters the Funding or Rental Agreement . . ." The Customer Agreement also incorporates a ten page eBrochure listed on a

5

web site.  The eBrochure displays a 3Com logo in the upper right-hand corner of the first page of the document, but no Capital 4 logo anywhere on the document.  The eBrochure also states that "the Power of $Zero Partnership" developed the Power of $Zero solution, that Capital 4 launched the 3Com Power of $Zero Solution "in partnership with the 3Com Corporation," and that "3Com has selected Capital 4 as the [public access services] Provider under the 3Com Power of $Zero Solution."  The last page of the eBrochure states that

> All of the terms of the transaction between [Carlyle] and Capital 4 are set forth in the 3Com Power of $Zero Customer Agreement, including the attached Schedule "A", and this section of the 3Com Power of $Zero Solution website (titled, "How does the 3Com Power of $Zero Solution Work?") which is specifically incorporated by reference.
>
> Customer represents that he . . . is not relying upon any promise or representation of any kind made by any other party, except as expressly stated in the Agreement.  The Agreement supersedes any and all prior agreements, arrangements, or understandings between the parties relating to this transaction, and no oral understandings, statements, promises, or inducements contrary to the terms of the Agreement exist.

The last paragraph of the last page of the eBrochure contains a Texas choice of law provision.

In deciding to execute the Customer Agreement Carlyle relied on representations made by Capital 4 and SolutionPros, the Power of $Zero website, and John Shupe's discussions with Clark Thompson and Mark Kerr.  Because the program was branded by 3Com, Thompson presented the 3Com Power of $Zero Solution to Shupe as if it were just another piece of 3Com equipment.  In entering the program on Carlyle's behalf, Shupe never saw 3Com and Capital 4 as being separate entities.

On April 26, 2006, Carlyle signed a document titled "Business Communication Lease Agreement" with Main Street Bank.  By its terms this agreement was a funding vehicle for the 3Com Power of $Zero Solution allowing the customer to achieve a monthly payment structure.

6

Carlyle did not receive any new 3Com equipment in connection with its signing the Customer Agreement, and continued to use its existing 3Com equipment which it had purchased from SolutionPros in 2004.

On November 10, 2006, 3Com and Capital 4 entered into a License Agreement and an Operations Agreement pursuant to which 3Com purchased the right to use the "Power of $Zero" brand, including the POZ Marketing Tools, POZ Solution, POZ Program and POZ Documentation. It is undisputed that during a transition period from November 10, 2006, until April 1, 2007, Capital 4 was allowed to sell the 3Com Power of $Zero Program on 3Com's behalf. During this period Capital 4 also had the responsibility of providing Public Access Services to each customer to whom the 3Com Power of $Zero program was sold.

The Operations Agreement defines the "3Com Power of $Zero Customer Agreement" as "all POZ contracts presented by the 3Com [value-added reseller] to the Customer, and executed by the Customer, prior to and after the Effective Date of the License Agreement, which documents the Customer's rights, duties, and obligations under the 3Com POZ Solution or the 3Com POZ Program." The Operations Agreement defines the "3Com POZ$_{TM}$ Program" as "the 3Com branded POZ$_{TM}$ Solution promoted by 3Com and 3Com's authorized POZ$_{TM}$ [value-added resellers]." Section 2.5.1 of the Operations Agreement provides, in pertinent part, that:

> Capital 4 shall provide, and shall be solely responsible and liable for providing all: (1) Public Access Services to be delivered under the 3Com Power of $Zero Program; (2) obligations under the POZ VAR Agreements; and (3) the 3Com Power of $Zero Customer Agreements entered into prior to the Actual Cut Date.

Section 2.5.2 of the Operations Agreement states that:

> Capital 4 shall be responsible for all subcontracting and payments to all Public Service providers associated with 3Com Power of $Zero Customer Agreements entered into prior to the Actual Cut Date. Upon 3Com's notice to Capital 4 of Capital 4's failure to

perform any or all of the obligations contemplated in this Section 2.5.2, 3Com shall be entitled to assume the obligations associated with the affected 3Com Power of $Zero Customer Agreements.

The Operations Agreement also contains a section entitled the "Go Dark" Solution. Section 4.3.1 states the purpose of this provision is "to further protect the POZ Program by preventing the interruption, temporary suspension or cancellation of services provided by Public Access Assets Service providers to POZ Customers under the POZ Customer Agreements, existing prior to and during the term of this Operations Agreement . . ." Other relevant sections of the Go Dark provision state,

> 4.3.2 . . . If an event of eminent interruption of service is not remedied by Capital 4 . . . 3Com, at its sole discretion, may assist Capital 4, financially or otherwise, under terms and conditions agreed upon by the Parties, to remedy or cure any such default under the Public Access Assets Service Agreements.
>
> * * *
>
> 4.3.3 Immediately following commercially reasonable indications: (i) of Capital 4's intent to declare itself insolvent; or (ii) that Capital 4 is otherwise temporarily unable to honor its obligations under the existing POZ™ Customer Agreements:
>
> > (a) Capital 4 shall produce a residual analysis and portfolio report … to 3Com.
> >
> > * * *
> >
> > (d) 3Com *shall* assume all of the obligations of any and all Public Access Assets Service agreements entered into by Capital 4 in connection with 3Com Power of $Zero Customer Agreements.

(Emphasis added.)

Section 7.1 of the Operations Agreement provides that,

> Neither Party may transfer or assign this Operations Agreement, or any rights or obligations hereunder, without the prior written consent of the other Party[.] In addition, and subject to the

> restrictions set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective, heirs, legal representatives, successors and assigns.

Finally, section 7.2 of the Operations Agreement contains a New York choice of law provision.

Near the end of July 2007, Capital 4 informed 3Com that it was having short-term difficulty paying public access service providers. In response, 3Com sent Lawrence Langmore to Capital 4's offices to evaluate its financial condition. Following Langmore's assessment, 3Com made a series of cash infusions, totaling $600,000, to Capital 4 based on the latter's request for assistance paying public access service providers. Each of these payments was memorialized by promissory notes. Each promissory note recites that the funds provided would be used by Capital 4 to pay Public Access Service providers.

On August 7, 2007, 3Com and Capital 4 executed a "First Contract Amendment" which by its terms became effective August 6, 2007. 3Com did not, however, provide any consideration for the amendment, and Carlyle contends it was not an effective amendment.

The amended Go Dark language purports to expand the scope of the customer agreements 3Com could assume in the event that Capital 4 failed to fulfill its obligations to pay Public Access Service providers. Whereas the original Go Dark provisions covered only the 3Com Power of $Zero customer agreements, the First Contract Amendment grants 3Com discretion to assume the Capital 4 Power of $Zero customer agreements. It states:

> Section 4.3 ["Go Dark" Solution]… of the Operations Agreement is hereby deleted in [its] entirety and replaced with the following:
>
> * * *
>
> 4.3.3(c) Upon request by 3Com, Capital 4 shall assign to 3Com all rights and obligations of Capital [4] under those Capital 4 POZ Customer Agreements which 3Com, in its sole discretion, believe[s] may have a Material Adverse Effect on 3Com if such Customer Agreements are not assigned to 3Com.

> 4.3.3(e)  3Com shall assume all of the obligations of any and all Public Access Service commitments entered into by Capital 4 in connection with those Capital 4 Power of $Zero Customer Agreements assigned to 3Com pursuant to Section 4.3.3(c) above.

In September 2007, Carlyle's public access service carrier notified Carlyle that its service was at risk due to Capital 4's non-payment of its bills.

## Discussion

**I.    3Com could be liable to Carlyle on Counts II and IV.**

Count II of Carlyle's claims against 3Com asserts a claim for indemnification. Carlyle alleges that "[t]o the extent Carlyle is liable to pay money to Main Street, then 3Com is contractually obligated under the Customer Agreement, as assumed by 3Com in its agreements with Capital 4, and as a member of the Power of $Zero Partnership, to indemnify and hold harmless Carlyle against such liability." Carlyle's Third Amended Counterclaims and Third-Party Claims (doc. 120), ¶ 59. Similarly, Count IV brings a breach of contract claim, alleging that "3Com breached the Customer Agreement, as assumed by 3Com in its agreement with Capital 4, and as a member of the Power of $Zero Partnership, by among other things, failing to provide or continue telecommunications services to Carlyle." *Id.*, ¶ 66. Carlyle further alleges that "3Com also breached the 'Go Dark' provision of the Operations Agreement as amended between Capital 4 and 3Com, of which Carlyle is a third-party beneficiary." *Id.*, ¶ 67.

3Com argues it is entitled to summary judgment on these claims because (1) the Customer Agreement is between Carlyle and Capital 4 only; (2) 3Com did not assume Capital 4's obligations to Carlyle; and (3) Carlyle is not a third-party beneficiary.

10

**A. There is a genuine issue of material fact whether 3Com and Capital 4 were partners by estoppel.**

Carlyle argues that 3Com is liable for any breach of obligations flowing to Carlyle, because 3Com represented itself as Capital 4's partner, and Carlyle reasonably relied on this representation. 3Com denies that it and Capital 4 are partners by estoppel, or that there was any reasonable reliance.

As a threshold matter the Court must decide what law to apply in deciding the partnership by estoppel question. Both parties alternately cite Missouri and New York law for the applicable rule of decision, but neither has explained which state's law should apply, or why. Both options appear plausible: The Operations Agreement between 3Com and Capital 4 contains a New York choice-of-law provision, but the Customer Agreement between Capital 4 and Carlyle was solicited and signed in Missouri. Fortunately, both states have adopted the Uniform Partnership Act,[4] and there does not appear to be any difference in the states' application of the law, thus there is no conflict for the Court to resolve. *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007) (holding that before applying the forum state's choice of law rules, a trial court must first determine whether a conflict exists; if the outcome would be the same under either forum's law, the trial court need not resolve the conflict.) *Id.* For the sake of convenience the Court will cite to Missouri authority, but it would reach the same result applying New York law.

Under the Uniform Partnership Act a person who is not a partner may be held to be a partner for the purpose of third parties under a partnership by estoppel theory. Mo. Rev. Stat. § 358.160.1 (2010). A partnership by estoppel occurs "[w]hen a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to anyone, as a

---

[4] *Compare* N.Y. Partnership Law § 27 (McKinney 2005), *with* Mo. Rev. Stat. § 358.160.1 (2010).

partner in an existing partnership or with one or more persons not actual partners . . ." *Id.* When a partnership by estoppel exists, the partner by estoppel is "liable to any such person to whom such representation has been made" and is liable for partnership debts as though he were an actual member of the partnership. *Id.* The person who claims partnership by estoppel exists, however, must have been reasonable in his reliance on the representations of another. *Binkley v. Palmer*, 10 S.W.3d 166, 171 (Mo. App. 1999); *Irwin Seating Co. v. IBM*, No. 1:04-CV-568, 2007 WL 2351007, at *11 (W.D. Mich. Aug. 15, 2007) (discussing partnership by estoppel under the Uniform Partnership Act).

To establish a partnership by estoppel the plaintiff must show (1) the defendant represented himself as a partner or consented to another person's representation that he is a partner of one with whom he is not partners, and (2) the person to whom the false representation is made must have reasonably and detrimentally relied on that representation. *Irwin Seating*, 2007 WL 2351007, at *11.

There is evidence on the record that 3Com, through its employee Glen Ewing, provided training and materials (or at least allowed such materials to be given) to Clark Thompson of SolutionPros, that branded the program as a 3Com program, and that 3Com actively marketed and sold the program to customers as a program in which 3Com was a partner. There is also evidence that during the training Thompson was told that the program was funded and backed by 3Com, and that based on representations made at the training and the 3Com branding on the materials Thompson believed 3Com backed and funded the entire program. Thompson subsequently sold the program to Carlyle's representative, John Shupe, as if it were just another piece of 3Com equipment, so that Shupe never saw 3Com and Capital 4 as being separate entities.

Of course, the Customer Agreement states that the agreement is between Capital 4 and Carlyle, and that Capital 4 agreed to "provide, maintain, and support all of Customer's Public Access Services in accordance with the 'How Does the 3Com Power of $Zero Solution Work? section of the eBrochure." The eBrochure states,

> Customer represents that he . . . is not relying upon any promise or representation of any kind made by any other party, except as expressly stated in the Agreement. The Agreement supersedes any and all prior agreements, arrangements, or understandings between the parties relating to this transaction, and no oral understandings, statements, promises, or inducements contrary to the terms of the Agreement exist.

But the eBrochure also emphasizes some sort partnership with 3Com and minimizes Capital 4's role or responsibility.

Although it is a close call, the Court cannot find 3Com has established that it is entitled to summary judgment on this claim. 3Com's strongest argument is that a party who is capable of reading and understanding a contract is deemed to have knowledge of the contents of any contract he signs, absent a showing of fraud. *Binkley*, 10 S.W.3d at 171. While Carlyle signed the Customer Agreement incorporating the eBrochure, nothing in either document suggests that Capital 4 was not in partnership with 3Com to provide public access services, something that could reasonably be inferred from the sales pitch made to Carlyle. There is also evidence that 3Com knew about this sales pitch, and thus knew that Carlyle was being led to believe 3Com was a partner in providing public access services.

In denying summary judgment the Court notes the absence of any provision in the customer agreement or eBrochure clearly stating that Capital 4 was solely responsible for providing public access services, or that 3Com had no liability for any failure by Capital 4 to provide public access services, statements which would have precluded Carlyle from reasonably

relying on any representations made about 3Com's role in these transactions. *Irwin Seating Co.*, 2007 WL 2351007, at *12 (holding no partnership by estoppel where the contract between the plaintiff and defendant "expressly and unambiguously" disclaimed liability for the work of the business partners). Although provisions in the Operating Agreement made between 3Com and Capital 4 provide that Capital 4 is solely responsible for providing public access services, there is no evidence that Carlyle had knowledge of these provisions.

Accordingly, the Court rules 3Com has not established that it and Capital 4 could not have been partners by estoppel.

**B.     Given the Operations Agreement and the facts on the record, a jury could find 3Com assumed Capital 4's obligations to Carlyle.**

3Com also argues it is entitled to summary judgment that it did not assume Capital 4's obligations to Carlyle. 3Com argues that the Operations Agreement gave 3Com the option of stepping in to deliver public access services to customers who Capital 4 could no longer deliver services, and that it was not obligated to provide such services to Carlyle.

Again, the initial question here is a choice of law question: Which state's law should be used to interpret the Operations Agreement? 3Com cites Missouri law, but the agreement contains a New York choice of law provision. A federal court sitting in diversity applies the choice of law rules of the state where it sits. *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007). This Court sits in Missouri, and under Missouri law a choice of law provision in a contract is enforceable unless application of the provision is "contrary to a fundamental policy of Missouri." *Cicle v. Chase Bank USA*, 583 F.3d 549, 553 (8th Cir. 2009) (quoting *Kagan v. Master Home Prods., Ltd.*, 193 S.W.3d 401, 407 (Mo. Ct. App. 2006)). There is no suggestion that application of the New York choice of law provision is contrary to any

14

fundamental policy of Missouri, so the Court will use New York law to interpret the Operations Agreement.[5]

Under New York law the court's "role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract." *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 872 (N.Y. 2004). The best evidence of what the parties intended is what they wrote in their contract. *Innophos, Inc. v. Rhodia, S.A.*, 882 N.E.2d 389, 392 (N.Y. 2008).

Section 4.3.3, the "Go Dark" provision of the November 10, 2006 Operations Agreement, provides that,

> Immediately following commercially reasonable indications . . . that Capital 4 is otherwise temporarily unable to honor its obligations under the existing POZ™ Customer Agreements . . . (d) 3Com shall assume all of the obligations of any and all Public Access Assets Service agreements entered into by Capital 4 in connection with 3Com Power of $Zero Customer Agreements.

Section 1.7 also makes clear that the Operations Agreement applies to all POZ contracts presented by a 3Com value added reseller, such as SolutionPros, to a customer, such as Carlyle, "prior to and after" the effective date of the Operations Agreement.

Applying these provisions to the facts as found for purposes of resolving this motion, the Court holds as follows. On March 28, 2006, Capital 4 and Carlyle entered into a contract, the "3Com Power of $Zero Customer Agreement," under which Capital 4 agreed to provide Carlyle with public access services. Because this was a 3Com Power of $Zero Customer Agreement, the Operations Agreement obligated 3Com to assume all of Capital 4's obligations to Carlyle in the event that there were commercially reasonable indications that Capital 4 was unable to honor its obligations. Near the end of July 2007 3Com received such commercially reasonable

---

[5] That said, it does not appear that the agreement would be interpreted differently under Missouri law. *Compare Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1023 (8th Cir. 2006), and *Helterbrand v. Five Star Mobile Home Sales, Inc.*, 48 S.W.3d 649, 658 (Mo. Ct. App. 2001), *with Evans v. Famous Music Corp.*, 807 N.E.2d 869, 872 (N.Y. 2004) and *Innophos, Inc. v. Rhodia, S.A.*, 882 N.E.2d 389, 392 (N.Y. 2008).

indications: Capital 4 informed 3Com that it was having short-term difficulty paying public access service providers, and 3Com responded by loaning $600,000 to Capital 4 to help it pay public access service providers. At that point 3Com was required to assume Capital 4's obligations to Carlyle.

The Court denies 3Com summary judgment on this point.

**C.   There is evidence on the record which supports holding Carlyle is a third-party beneficiary of the Operations Agreement.**

3Com also argues that Carlyle is not a third-party beneficiary to the Operations Agreement because (1) 3Com did not have any obligations to Carlyle under the original Go Dark language; and (2) the agreement contains language negating any inference of third-party beneficiary rights; and (3) the amendment to the Operations Agreement extinguished any third-party beneficiary rights that may have existed. With respect to the first argument, the Court previously found there is evidence that 3Com assumed Capital 4's obligations to Carlyle, so the Court now turns to 3Com's second argument.

Under New York law only intended beneficiaries may assert a claim as a third-party beneficiary. *Ackess Pac. Group L.L.C. v. Winstar Commc'ns. Inc.*, 67 F. Supp. 2d 394, 399 (S.D.N.Y. 1999). "A third party is an intended beneficiary if the language of the contract clearly evidences an intent to permit enforcement by the third party." *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 212 (N.Y. 1985). It is not necessary that the third party beneficiary be named in the contract, but the terms of the contract must express directly and clearly an intent to benefit an identifiable person or class. *Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Trust Co.*, 261 A.D.2d 117, 123 (N.Y. App. Div. 1999). "Where a provision in the contract expressly negates enforcement by third-parties, that provision is

16

controlling." *Edward B. Fitzpatrick, Jr. Const. Corp. v. County of Suffolk*, 128 A.D. 2d 446, 449-50 (N.Y. App. Div. 1988).

3Com argues that Carlyle is not a third party beneficiary because the Operating Agreement contains both a non-assignability clause and an inurement clause, and courts applying New York law have consistently found that the presence of these clauses in a contract is inconsistent with an intention to confer a benefit on a third party. *See, e.g.*, *Picoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 163-64 (S.D.N.Y. 1998). While true, express language in the "Go Dark" provision makes clear that it was designed to protect the POZ Program by ensuring that customers such as Carlyle would enjoy uninterrupted service. It states, "[i]n order to further protect the POZ Program by preventing the interruption, temporary suspension or cancellation of services provided by Public Access Assets Service providers to POZ Customers under the POZ Customer Agreements, existing prior to and during the term of this Operations Agreement . . ." Section 4.3.3(d) reiterates that it was the parties' intention to ensure that customers such as Carlyle received uninterrupted service. Accordingly the Court holds the original "Go Dark" language obligated 3Com to provide such services.

Third and finally, 3Com argues that even if the original "Go Dark" provision obligated 3Com to assume Capital 4's customer agreements, any such obligation was eliminated by the First Contract Amendment which gave 3Com discretion to assume Capital 4's obligations to Carlyle. Without even addressing the question whether the amendment was invalid for lack of consideration, the Court notes that there is evidence that an event triggering 3Com's duty to assume Capital 4's obligations occurred near the end of July 2007, before the First Contract Amendment became effective, when 3Com loaned Capital 4 $600,000 to pay public service access providers. Consequently, for purposes of resolving the pending summary judgment

17

motion the Court finds the First Contract Amendments did not extinguish 3Com's assumption of Capital 4's obligations.

Accordingly, 3Com's motion for summary judgment is denied with respect to Counts II and IV of Carlyle's complaint.

## II. Disputed questions of material fact exist on Counts V and VI.

3Com argues that Carlyle's claims for negligent misrepresentation (Count V) and fraudulent misrepresentation (Count VI) must fail because 3Com made no representations to Carlyle, but this argument must be denied because it relies on several disputed questions of material fact. 3Com contends that in deciding to execute the Customer Agreement Carlyle relied exclusively on representations by Capital 4 and SolutionPros, and not by any representations 3Com. There is evidence on the record, however, that Carlyle also relied on representations made by Mark Kerr, who was described at a sales training event as a "3Com Business Development Manager," thus there is a question of fact whether he was a 3Com representative and whether 3Com made representations on which Carlyle relied. This is reinforced by the way 3Com and Capital 4 instructed Clark Thompson, a SolutionPros employee, and the way Thompson subsequently presented the 3Com Power of $Zero Solution to Shupe as if it were just another piece of 3Com equipment. This is also evidence that 3Com and Capital 4 were partners, or, if they were not partners, Shupe acted reasonably in never viewing them as separate entities.

3Com also argues it is "undisputed" that 3Com and Capital 4 were independent contractors and without authority to act on each other's behalf. 3Com cites the Strategic Alliance Agreement as proof. But it is unclear from the record whether the Strategic Alliance Agreement was ever actually entered into, and the Court cannot rely on it for purposes of this order.

In short, the Court finds there are multiple disputed questions of material fact here which preclude granting 3Com summary judgment on Counts V and VI.

**III.     3Com has not carried its burden with respect to Count VII.**

Finally, 3Com contends it is entitled to summary judgment on Carlyle's conspiracy to commit fraud claim (Count VII) because a conspiracy claim relies on an underlying tort, which Carlyle has failed to establish. Carlyle responds that 3Com is liable for misrepresentation and fraud under theories of partnership by estoppel and apparent agency, consequently an underlying tort does exist. Given that 3Com is not entitled to summary judgment on the misrepresentation and fraud claims, both of which are torts, 3Com is not entitled to summary judgment on this count either.

**Conclusion**

For the reasons discussed above, 3Com's Motion for Summary Judgment (doc. 180) is DENIED.

**IT IS SO ORDERED.**

DATE: <u>December 8, 2010</u>                    <u>/s/ Greg Kays</u>
                                                 GREG KAYS, JUDGE
                                                 UNITED STATES DISTRICT COURT